**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **J.S., a minor by his** ) | |
| **Parent and Next Friend, L.S.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.: _____** |
| ) | |
| **FAIRFAX COUNTY SCHOOL BOARD,** ) | |
| **8115 Gatehouse Road** ) | |
| **Falls Church, VA 22042** ) | |
| ) | |
| **Defendant.** ) | |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff, J.S., a minor by her Parent and Next Friend L.S., by and through undersigned counsel, and states as follows:

### <u>Preliminary Statement</u>

1.      Plaintiff brings this civil action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (the "IDEA"), Virginia Code § 22.1-213, *et seq.*, and the corresponding federal and state implementing regulations for such laws.

2.      In Count One, Plaintiff seeks an award of attorneys' fees and costs as a prevailing party in a due process proceeding brought pursuant to the IDEA.

3.      In Count Two, Plaintiff seeks judicial review regarding the Special Education Hearing Officer's (the "Hearing Officer") denial of the parents' request for reimbursement of private school tuition for the 2021-22 and 2022-23 school years and regarding the Hearing Officer's failure to address certain issues raised in the due process proceeding.

4.     In Count Three, Plaintiff seeks a declaratory judgment regarding Student's stay-put placement in light of the Hearing Officer's Decision that the January 27, 2021, IEP denied Student a free appropriate public education ("FAPE").

## Parties

5.     J.S. ("Student") is an eleven-year-old minor who resides within Fairfax County and is a Fifth-Grade student at a private day school for students with learning disabilities. Student previously attended Fairfax County Public Schools ("FCPS") until his parents withdrew him from the school division due to FCPS' denials of FAPE.

6.     L.S. (the "Parent") is Student's mother and resides in Fairfax County, Virginia with Student.

7.     Defendant Fairfax County School Board ("FCSB") is the governing body of FCPS, a public school system located in Fairfax County, Virginia. FCSB is a Local Educational Agency ("LEA") as that term is defined by state and federal law regarding the provision of educational services to individuals residing within its boundaries.

## Jurisdiction and Venue

8.     This Court has jurisdiction over this matter pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. §§ 1331, 1343.

9.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391 because: (i) Defendants operate a place of business within this judicial district and has sufficient contacts with this judicial district to subject it to personal jurisdiction at the time this action is commenced; and (ii) the acts and omissions giving rise to this claim have occurred within this judicial district.

10.     Parent timely filed, and obtained, a request for a special education due process hearing and has exhausted all administrative remedies pursuant to the IDEA.

**Statement of Facts**

A.     Student's Disability-Related Educational Needs Prior to the Covid-19 Pandemic.

11.     Student is a child with a disability as such term is defined under the IDEA. Pursuant to the IDEA and Virginia law, Student is eligible for special education services in the category of Specific Learning Disability. He has a diagnosis of dyslexia, with deficits in both reading and spelling.

12.     Student was first found eligible for special education in 2017 in the category of Developmental Delay. He began receiving special education and related services from FCPS in pre-school.

13.     At a December 12, 2018, IEP meeting (during First Grade), Parents asked FCPS to evaluate Student for dyslexia because he was performing below grade level expectations in reading, writing, and math. FCPS denied this request. Parents reiterated their request to evaluate Student for dyslexia at a February 13, 2019, IEP meeting. FCPS again declined.

14.      Student's literacy skills continued to remain significantly below grade level during Second Grade. He struggled to understand letters and had difficulty with numbers. Student became increasingly self-aware of his expanding deficits in comparison to his peers, which began to adversely impact his self-confidence and willingness to attend school.

15.     Parents continued to communicate their concerns to FCPS and their request to evaluate Student for a learning disability. In the fall of 2019, FCPS finally agreed to conduct a re-evaluation. At or about that time, Student's teacher documented his inability to read, his difficulty

remembering content, negative self-talk, and his need for "a very structured classroom environment where he is receiving support for all core content areas."

16.     FCPS convened an eligibility meeting on December 4, 2019, at which time Student was found eligible for special education in the category of Specific Learning Disability. The eligibility team identified that Student demonstrated underachievement in basic reading skills, reading comprehension, reading fluency, mathematical calculation, mathematical problem solving,  written expression/spelling, and oral expression. The IEP team further identified that Student had a processing disorder that adversely impacted his phonological processing and visual-spatial processing. The team also determined that Student no longer met the eligibility criteria for Developmental Delay. Parents consented to the change in eligibility category.

17.     Anthony Henley, Psy.D. performed a psychoeducational evaluation of Student in January 2020. Dr. Henley's written report identified deficits in the areas of reading, writing, spelling, the ability to recall information, and phonological awareness. Reading tests revealed "severe deficits" with Student's ability to read real words. The evaluation also revealed significant difficulties with phonetic decoding skills, placing Student at "below the entering kindergarten level" in this skill. Student also displayed "extremely poor spelling skills" and severe deficits in terms of his writing abilities.

18.     Dr. Henley diagnosed Student with dyslexia based on his deficits in reading, spelling, motor coordination, verbal memory, and phonological processing skills. Dr. Henley concluded that Student had a "severe learning-based language disability that is impacting on all areas of academic achievement, with reading and writing being particularly impaired." Dr. Henley recommended that Student receive "intensive work with an educational specialist to address

4

underlying difficulties. Such work should include a structured multisensory instructional approach to teaching basic reading and spelling skills." Specifically, he stated that "[a]n Orton-Gillingham-based program is needed, given the nature of the severe difficulties [Student] is exhibiting."

19.     The IEP team convened on February 11, 2020. FCPS acknowledged that Student "did possess some characteristics that are common in dyslexia." Nonetheless, FCPS did not add goals for phonemic awareness, letter formation, or morphology. FCPS did not include an Orton-Gillingham-based, multisensory, structured approach to reading and writing. Nor did FCPS revise Student's service hours.

B.      The Covid-19 Pandemic's Impact on Student's Ability to Access an Education.

20.     The IEP team again convened on May 14, 2020. By that time, the Covid-19 pandemic had begun and FCPS was only providing its students with virtual services, without any special education support. Prior to the pandemic, all of Student's special education services and supports were delivered in an in-person, school-based setting.

21.     The May 14, 2020 IEP (the "May 2020 IEP") documented Dr. Henley's diagnosis that Student "demonstrated a severe language-based learning disability impacting all academic areas and met criteria for a diagnosis of Dyslexia." Nonetheless, FCPS did not accept Dr. Henley's recommendation for a "structured multisensory instructional approach to teaching basis reading and spelling skills." Instead, FCPS proposed to continue using a program providing "explicit instruction for reading with a proven reading program that addresses his diagnosis of dyslexia." The program FCPS had been using, and proposed to use in the future, was not multisensory and was not appropriate for Student's learning disability – as was evident from his lack of meaningful progress while using such program. Moreover, FCPS did not propose new, or

revised, goals to address Student's significant literacy needs. FCPS only proposed a math goal for addition and subtraction. No other changes were made to Student's IEP.

22.     Student struggled to meaningfully access an education while FCPS delivered virtual only services, without in-person special education support, during April 2020 through June 2020.

23.     The expectation in early July 2020 was that FCPS would return to in-person instruction when the 2020-21 school year began.  On July 21, 2020, FCPS announced that the 2020-21 school year would begin with all students – including students with disabilities – attending virtually, beginning September 8, 2020.

24.     FCPS began the 2020-21 school year on September 8, 2020 and offered only virtual instruction, without any in-person special education services or supports.  It did so even though Student's May 2020 IEP remained in full effect and despite Student's educational needs as a child with a disability remaining unchanged since May 14, 2020.

25.     During virtual learning, students attended synchronous online classes Tuesday through Friday. On Mondays, students would access asynchronous education. This environment was not appropriate for Student's disability related needs, especially given his need for a multisensory structured approach to learning.

26.     Student was in Third Grade for the 2020-21 school year. Student's teacher reported that he began the 2020-21 school year reading at a DRA 2 level, which equates to the kindergarten level. His skills demonstrate no meaningful progress from several years earlier.

27.     To the extent FCPS provided, or attempted to provide, Student with virtual special education services, such proffered services were functionally not available to Student. Student's

needs required in-person assistance, utilizing a multi-sensory, multi-modal structured approach to learning across settings for him to receive a FAPE.  FCPS continued to attempt to instruct Student in the Fundations reading program during the 2020-21 school year, which was not an appropriate instructional program given Student's intensive needs; nor was it multisensory.

28.    Student struggled throughout the first quarter of the 2020-21 school year, did not make meaningful progress on his IEP goals, and continued to remain significantly below grade level with his literacy skills. In addition, Student's self-confidence declined and he appeared increasingly more upset each school day.

29.    Internal FCPS emails during September and October 2020 acknowledged concerns regarding Student's lack of meaningful progress (if not regression), concerns about the denial of FAPE, and concerns that the parents might pursue legal action against FCPS. In one instance, the Principal expressed concern about Plaintiff's request to speak with Student's teacher in September 2020, worrying that "Mom can go the legal route if [the teacher] says something wrong regarding services and support." Similarly, the shared that she was "worried about saying the wrong thing and keeping the school protected."

30.    Student functionally was unable to access a FAPE during virtual instruction. It was difficult for Student to interact with teachers and peers, both verbally and using written language. It was difficult for him to read information on the computer screen. Student became increasingly self-conscious of the language-based learning deficits and perceived classmates as making fun of him and mocking his difficulty with communication. Student vocalized to his Parents that he hated school and did not want to participate in online learning.  Student sometimes had meltdowns and would refuse to go to the computer, despite the parents' efforts to "help guide

Student back in front of the computer." He would not turn on the computer camera, microphone, or sound, or simply refuse to log on.

31.     Student's assessments during the fall 2020 documented his continued performance significantly below grade level. Student's inability to receive a FAPE by virtual instruction exacerbated the denial of FAPE. FCPS staff were unable or unwilling to provide him appropriate instruction. FCPS continued to use a literacy program that was not appropriate for Student's intensive needs due to his dyslexia.

32.     By November 2020, Student continued to perform well below grade level and struggled to participate in school activities or assignments that required reading and writing skills. During this meeting, FCPS acknowledged Parents' concern that Student "has been recently engaging in a lot of negative self-talk," that Student "currently does not like school," and "that they have not observed him making significant progress."

33.     FCPS convened an IEP meeting on November 18, 2020, due to Parents' continued concerns regarding Student's lack of meaningful progress.  FCPS still was not providing him with an appropriate structured program delivered with fidelity – and certainly not a direct, multi-sensory literacy program per Dr. Henley's professional recommendation. Parents also were concerned because virtual learning was not appropriate for Student.

34.     At the November 18, 2020 IEP meeting, Parents asked the IEP team to provide Student with private day placement at a program providing in-person educational services, including multi-sensory and multi-modal instruction throughout the school day. This placement was Student's least restrictive environment and was required for Student to make meaningful progress on his disability related educational needs. FCPS rejected Parents' request, proposed

8

public day school placement, and proposed to continue providing virtual instruction without in-person special education support. FCPS also proposed alternative services to be provided if it returned to in-person instruction at some future, albeit unknown, date.

35.     Parents notified FCPS on December 10, 2020, that they rejected the November 2020 IEP because it did not provide FAPE, that Student required private day placement at a school that would appropriately provide for his learning disability, that they intended to withdraw Student from FCPS and parentally place him, and that they intended to seek reimbursement from FCPS for all costs and expenses incurred for the private school placement. Parents reiterated their position in a December 30, 2020 letter to FPCS.

36.     FCPS reconvened the IEP team on January 27, 2021, and once again proposed an IEP (the "January 2021 IEP") delivering Student virtual services, without in-person special education services and supports. The January 2021 IEP did propose direct, multisensory in literacy instruction for a small portion of the school day, although only one teacher had been trained in the methodology (and her training and experience in the methodology arise from a one-week class in summer 2020). This instruction would not be provided across school settings and would not be provided by in-person special education instruction.

37.     Parents verbally informed the IEP team on January 27, 2021 that they rejected the January 2020 IEP because it did not provide FAPE. The proposed public day placement was not Student's least restrictive environment ("LRE") because virtual learning environment was not appropriate for Student to receive FAPE given his unique and individualized needs and given his circumstances. The IEP also did not appropriately address Student's learning disability needs. Parents stated at the IEP meeting that they did not consent to the January 2021 IEP's proposed

placement, that they intended to withdraw Student from FCPS and enroll him in a private day school that appropriately met Student's educational needs, and that they intended to seek reimbursement from FCPS.

38.      Parents reiterated their rejection, in writing, on February 16, 2021.

C.      Parents' Withdrawal of Student From FCPS and Their Unilateral Private Day Placement.

39.      Throughout the 2020-21 school year FCPS had projected dates when Student (and similarly situated students) might be eligible to return to in-person instruction. Those dates were repeatedly delayed. Moreover, even the small number of students with disabilities who had been allowed to return to in-person classes in late October 2020 (albeit for only four days per week) were forced to return to virtual-only instruction by December 2020 due to a surge in the number of students and staff testing positive for Covid-19. Those students still had not returned to in-person instruction as of January 27, 2021. Parents had no reasonable expectation that Student's return to in-person instruction was imminent or that any return would remain consistent for the remainder of the school year. Moreover, Student independently required private day placement as his LRE for reasons beyond the fact that he could not access FAPE in a virtual school environment.

40.      Parents thereafter withdrew Student from FCPS and enrolled him at a private day school located in central Virginia ("Private School 1") that specializes in educating children with language-based learning differences. It is undisputed that Private School 1 was a proper private school placement under the IDEA because it was reasonably calculated to enable Student to receive educational benefits.

41.     Parents had endeavored to enroll Student in an appropriate school closer to their home in Fairfax County. Unfortunately, no appropriate private schools offering in-person instruction in the metropolitan Washington, D.C., area had openings at that time.

42.     Student's enrollment at Private School 1 began on March 1, 2021. Private School 1 provided Student with in-person instruction and was an appropriate private school to address Student's special education needs. Student and his mother would stay in Charlottesville during the week and return home for the weekend.

43.     Shortly after enrolling at Private School 1, a private day school located in Washington, D.C. ("Private School 2") offered Student admission for the 2021-2022 school year, where he would receive in-person instruction five days per week. Private School 2 is an approved nonpublic day school by the District of Columbia's Office of the State Superintendent of Education for students eligible for special education in the categories of specific learning disability, speech or language impairment, multiple disabilities, or other health impairment.

44.     Parents signed Private School 2's 21-22 New Student Enrollment Contract in mid-March 2021. At that time, it remained unknown when FCPS might actually offer students in-person instruction – let alone in-person instruction five days per week, something that both Private School 1 and Private School 2 offered. In addition, Private School 2 enrollment would allow Student and his mother to live at home during the week with the rest of the family.

45.     Student's designated grouping among FCPS student did not begin to receive any in-person instruction until April 29, 2022. Those students were offered in person instruction four days per week and asynchronous instruction on the fifth day.

46.     At Private School 1, Student was taught using an Orton-Gillingham-based literacy program (a multi-sensory explicit literacy program) across educational settings. Contrary to his experience at FCPS, Student made meaningful progress while enrolled at Private School 1 in spring 2021. Student began to understand phonetic concepts for reading and made meaningful progress in mathematics. Student's attitude towards school greatly improved. Student received several awards recognizing his behavior, attitude, and work ethic, while enrolled at Private School 1. Student also exhibited more happiness after returning home from school. Student embodied more confidence, independence, and growth while learning in an environment utilizing a structured multisensory approach to learning across the curriculum.

47.     On July 30, 2021, in connection with a settlement communication to FCPS, Parents informed FCPS that Student would be switching from Private School 1 to Private School 2. Parents reiterated their prior communication that they intended to seek tuition reimbursement.

48.     Student began attending Private School 2 for the 2021-22 school year and continues to be enrolled there. Like Private School 1, Private School 2 provides Student instruction using an Orton-Gillingham based literacy program across all educational settings.

49.     Student continued to demonstrate meaningful progress with his disability related academic needs while attending Private School 2, including narrowing the gap that previously had expanded while he attended FCPS. By March 2022, Student was working on fourth grade math and had progressed 2 – 2.5 grade levels in reading.

50.     By the end of Fourth Grade (2021-22 school year) at Private School 2, Student was performing in the 41st percentile in math and demonstrated meaningfully improved writing skills.

51.     While enrolled in the private day programs at Private School 1 and Private School 2, Student made substantive and meaningful progress on his documented areas of need. Both Private School 1 and Private School 2 provided Student with a multi-sensory, multi-modal instructional approach to learning, delivered with fidelity that appropriately addressed his challenges as a student with a learning disability.  Both schools also provided Student with the appropriate services, supports, and accommodations to allow him to make meaningful progress.

52.     Dr. Henley reevaluated Student in April 2022, after he had been attending private school for about one year.  Dr. Henley's report identified "significant improvement with articulation" and "significant increase" in Student's in his scores for word identification and decoding. Dr. Henley's concluded that Student's "strong growth on these two subtests does indicate that he has responded well to the intensive reading interventions," he received while he attended Private School 1 and while currently attending Private School 2. Dr. Henley described Student's progress since he began receiving the intensive interventions available at Private School 1 and Private School 2 as demonstrating "extraordinary improvement."

53.     Dr. Henley's report provided his professional opinion that "continued placement at Private School 2, a special school for students with learning disabilities, is strongly recommended."

54.     It is uncontested that Private School 2 was a proper private school placement under the IDEA because it was reasonably calculated to enable Student to receive educational benefits.

D.     The OCR Letter of Findings.

55.     On January 12, 2021, the U.S. Department of Education's Office for Civil Rights ("OCR") notified FCPS that "it is initiating a directed investigation of the Fairfax County Public

Schools (District) due to disturbing reports involving the District's provision of educational services to children with disabilities during the COVID-19 pandemic." OCR stated that it "is concerned that the District has failed to provide a 'free appropriate public education' (FAPE) to each qualified student with a disability as required by federal law and denied students with disabilities equal access to education."

56.    On May 4, 2021, OCR asked FCPS to provide it with documents regarding "what the Division has done to address the effects of any pandemic-related disruptions in services required to meet the individual educational needs of students with disabilities."

57.    On November 30, 2022, OCR issued a letter regarding its findings of fact in the investigation and identified extensive non-compliance with federal law by FCPS in its delivery of FAPE to qualified students beginning in the spring of 2020 and continuing through the 2021-22 school year.  Summarizing its findings, the agency stated:

> Specifically, OCR found that during remote learning, the Division failed or was unable to provide a FAPE to thousands of qualified students with disabilities and failed to conduct evaluations of students with disabilities prior to making significant changes to their placements and to ensure that placement decisions were made by a group of persons knowledgeable about the students and the meaning of the evaluation data, in violation of the Section 504 regulation at 34 C.F.R. §§ 104.33 and 104.35; (2) directed staff to apply an incorrect standard for FAPE that was not compliant with the Section 504 regulation, and categorically reduced and placed limits on services and special education instruction provided to students with disabilities based on considerations other than the students' individual educational needs, in violation of 34 C.F.R. § 104.33; and (3) failed to develop and implement a plan adequate to remedy the instances in which students with disabilities were not provided a FAPE as required by Section 504 during remote learning. In addition, the evidence obtained to date raised compliance concerns that staffing shortages and other administrative obstacles resulted in non-provision of some FAPE services for students with disabilities; and that the Division did not accurately or sufficiently track services provided to students with disabilities to enable the Department to ascertain the Division's compliance with 34 C.F.R. § 104.33, as required by 34 C.F.R. § 104.61 (incorporating 34 C.F.R. § 100.6(b)).

58.    Among OCR's many factual findings pertinent to the present case:

•FCPS instructed staff that "for some students, IEP goals and objectives should be reduced, both qualitatively and quantitatively, to account for the virtual setting. . . . OCR did not obtain evidence suggesting that the Division anticipated making similar changes to the objectives that students in the regular education curriculum were expected to master at the time, despite also learning remotely.

•FCPS directed school staff in August 2020 that IEPs (which were being reviewed prior to the start of the school year) were limited to "a 'maximum number of hours' that could 'be documented on the IEP services page'—'no more than' 21 hours per week for elementary students, and 'no more than' 24 hours for middle and high school students."

•Evidence that FCPS "was not fully tracking when students were really receiving services online."

•An FCPS "study published in November 2020 [] demonstrates the significant impact on Division students with disabilities while learning remotely."

59.    Among OCR's analysis and many legal conclusions pertinent to the present case:

• "OCR found that, beginning with the spring 2020 shift to remote learning through the 2020-2021 school year, the Division categorically reduced and/or limited the services and special education that students were entitled to receive through their IEPs or Section 504 plans while learning remotely, in violation of 34 C.F.R. §§ 104.33 and 104.35."

• "OCR finds that throughout that period, the Division failed to appropriately develop and provide students with disabilities instruction and related services during remote learning that were designed to meet their individual educational needs, in violation of §§ 104.33 and 104.35."

• ". . . case managers were instructed to draft those virtual IEPs based on the goals and services already outlined in the IEP, but to revise them 'to focus on goals or objectives' that 'the student can achieve and can be realistically supported based on the number of days/hours' in the shortened 4-day week. In practice, however, that meant further reducing the instruction and services that some students on IEPs could receive and what they would be expected to learn during remote learning— beyond the 20% decrease in the school week for live instruction and services."

• "[T]he Division's documents also indicated a virtual IEP could water down what students were expected to master during remote learning . . . . The documents reflected that a virtual IEP could also lower how much a student was expected to master of that less ambitious material . . . . To date, OCR has obtained no evidence suggesting that the Division had similarly downgraded its academic expectations

15

for students without disabilities during the 2020-2021 school year, even though they, too, were learning remotely. To the contrary, in late August 2020, the Division had said publicly that it expected its students to master essentially the same material as in any other year, despite learning online."

• "The evidence OCR reviewed also raised further concerns that the Division may not have been accurately or sufficiently tracking services provided to students with disabilities during remote learning, as required for the Department to ascertain its compliance with 34 C.F.R. § 104.33."

• "[A]t a December 2020 webinar, several teachers expressed concern that the Division had instructed them to count students with disabilities present for virtual instruction even when those students were only logging in, but not turning on their cameras or microphones or otherwise engaging in instruction. Based on this evidence, OCR has concerns that during remote learning the Division may not have been adequately tracking the provision of its services, as required by 34 C.F.R. § 104.61 (incorporating 34 C.F.R. § 100.6(b)), to confirm that its students with disabilities were receiving an education and services consistent with 34 C.F.R. 104.33."

E.      The Request for Due Process Hearing.

60.      Parent filed a Request for Due Process Hearing with FCPS and VDOE, pursuant to the IDEA, on October 4, 2022. Parents alleged that the November 2020 IEP and the January 2021 IEP denied FAPE because they did not address Student's lack of meaningful progress and did not provide private day placement. Parents also alleged that FCPS' failure to provide in-person instruction during the 2020-21 school year denied FAPE.

61.      The due process hearing was held January 31, 2023 to February 3, 2023.

62.      The Hearing Officer issued his written Decision on February 22, 2023. A copy is attached as Exhibit A.

63.      The Hearing Officer's Decision found that "[a]t the November 18, 2020 and January 27, 2021 IEP team meetings, it was clear that Student was not making expected progress in the virtual education setting." In addition, the Hearing Officer found that "[t] There was no evidence

16

that FCPS proposed any sort of concrete action, such as providing a dedicated aide for Student, to address Student's poor online attendance and participation in virtual instruction." Dec. at 30

64.    The Hearing Officer further found that "[a]t both the November 18, 2020 and January 27, 2021 IEP team meetings, the parents requested that FCPS place Student in a private day school. However, in the January 27, 2021 IEP, school representatives continued to offer Student only virtual instruction pending a return to in-person classes, including 15 hours per week of online special education LD services, even though it was known that Student was not progressing with virtual, online, programming." Dec. at 30

65.    As a result of the foregoing, the Hearing Officer conclude that the FCPS members of the IEP "team's decision to provide Student only virtual instruction in the January 27, 2021 IEP was not reasonably calculated to enable Student to make progress appropriate considering his/her circumstance. This was a denial of FAPE." Dec. at 30 (footnote omitted).

66.    The Hearing Officer properly rejected FCPS' argument that the IEP's provision "for alternative special education services for Student for when schools would reopen" provided FAPE. The Hearing Officer explained:

> At the time of the IEP meeting, no one knew when FCPS would return to in-person classes. In fact, [FCPS] would not reopen fully for in-person instruction until April 29, 2022 and then for only 4 days per week. The possibility that Student might have been able to return to in-person classes at some point later in the IEP year does not save the IEP.

Decision at 30, ft. 3.

67.    Accordingly, the Hearing Officer awarded Parents reimbursement for Private School 1's tuition and associated expenses.

68.     The Hearing Officer denied reimbursement of Private School 2 tuition and fees Parents incurred for the 2021-22 and 2022-23 school years. The Hearing Officer did so even though at the time Parents signed the  Private School 2 enrollment contract no one knew when FCPS would return to in-person classes – let alone in-person classes five days per week. In fact, FCPS did not return to in-person classes for five days per week until the 2021-22 school year.

69.     The Hearing Officer's Decision did not address whether the November 2020 IEP or the January 2021 IEP denied FAPE because they "did not address the student's alleged lack of meaningful progress in reading, writing and communication and did not provide for a private day placement as Student's educational placement." Dec. Issues "a" and "b". The Decision focused on the denial of FAPE because FCPS did not the student in person special education services during the 2020-2021 school year. Dec. Issue "c".

Count One:
Request for award of attorneys' fees and costs
pursuant to the IDEA, 8VAC20-81-210, and 8VAC20-81-310

70.     Plaintiff repeats and realleges Paragraphs One through Sixty-Nine of the Complaint as if they were set forth in full herein.

71.     The IDEA, and the Virginia regulations implementing the IDEA, permit recovery of reasonable attorneys' fees by a parent who prevails in a due process hearing. 20 U.S.C. § 1415 (i)(3)(B); 34 C.F.R. § 330.517; 8VAC20-81-210; and 8VAC20-81-310; *see also J.P. v. Cnty. Sch. Bd.*, 447 F. Supp. 2d 553, 591 (E.D. Va. 2006).

72.     A party need not prevail on all claims to be regarded as the prevailing party because enforceable, material final relief on any IDEA claim is sufficient to make one a prevailing party.

*JP ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 641 F. Supp. 2d 499, 509 (E.D. Va. 2009).

73.     The determination of prevailing party looks at the significance of the relief awarded and whether there was a "judicially sanctioned change" in the parties' legal relationship. *See Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 121 S. Ct. 1835 (U.S. 2001); *see also JP ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 641 F. Supp. 2d 499, 509 (E.D. Va. 2009).

74.     The fundamental issue in the case was whether Student required private day school placement to receive FAPE.

75.     Parents are a prevailing party in the due process proceeding because the Hearing Officer concluded that the January 27, 2021 IEP did not provide Student a FAPE, that the private placement selected by Parents was appropriate because it was "reasonably calculated to enable the child to receive educational benefits, and that Parents "are entitled to reimbursement from FCPS for tuition and related expenses they incurred for their unilateral placement of Student at Private School 1 from March to July 2021."

76.     The IDEA states that an award of attorneys' fees "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished."  20 U.S.C. § 1415(i)(3)(C) and 8VAC20-81-310(C)(1).  Attorneys' fees may be awarded for attendance at IEP meetings "convened as a result of an administrative proceeding."  20 U.S.C. § 1415(i)(3)(D)(ii) and 8VAC20-81-310(C)(1).

77.     The "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *JP ex rel.*

*Peterson v. County Sch. Bd. of Hanover County, Va.*, 641 F. Supp. 2d 499, 509 (E.D. Va. 2009) (*citing Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).  "The result of that calculation is known as the lodestar figure. If properly computed, 'the lodestar figure will normally reflect a reasonable fee.'" *Id.* (citation omitted). As explained by this Court:

> To arrive at the lodestar figure, it is necessary to determine the appropriate hourly rate and the number of hours reasonably expended. Those two variables, as well as the lodestar figure itself, are assessed in light of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974).  *E.E.O.C. v. Service News Co.*, 898 F.2d 958, 965 (4th Cir.1990).  The twelve Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717–719. Using those factors, and other relevant decisional law, as a guide, the Court turns first to the determination of a reasonable hourly rate.

*JP ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 641 F. Supp. 2d 499, 512 (E.D. Va. 2009).

78.     Regarding the first *Johnson* factor, Parents incurred compensable attorneys' and expenses fees in the amount of $114,955.61 in connection with the due process case, through April 30, 2023. This is based on billable rates from $175.00 to $300.00 per hour. Such amount does not include the attorneys' fees and expenses incurred, or that will be incurred, in correction with the present civil action.

79.     Regarding the novelty and difficulty of the questions and the level of skill required by counsel (*Johnson* factors 2 and 3), special education law is a discrete practice area in which only a few attorneys in the Commonwealth of Virginia regularly practice.  The field requires a high level of skill by attorneys representing parents of students with disabilities and extensive knowledge of

state and federal special education laws and regulations.  No two cases are alike.  Each case is unique and individualized due to the specific student's disabilities, the way the student's disability impacts his or her access to an education, and the student's resulting needs for special education supports and services. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 181, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982); *JP ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 641 F. Supp. 2d 499, 514 (E.D. Va. 2009). The present case posed particularly novel issues because it addressed delivery of education by virtual means given the Covid-19 pandemic. Moreover, school divisions (as is the case here) typically have significantly greater resources available to them than parents and hire private law firms substantially larger than those who represent parents in special education matters.

80.     The fourth *Johnson* factor considers "the preclusion of employment by the attorney due to the acceptance of the case."  This case, as with other due process matters, requires that counsel provide a detailed level of attention and commitment a significant amount of legal services during several months.  Counsel's office is well-regarded in the field of special education law and is contacted by many prospective clients each week.  Counsel was required to forego or limit other legal opportunities and focus Student's matter from October 2022 to February June 2023, excluding the legal services involved in the present judicial action.

81.     Looking at the nature of the fee (*Johnson* factors five and six), special education law attorneys represent families of students with disabilities and typically charge a lower hourly rate than Virginia attorneys in other practice areas.  The attorneys at Belkowitz Law, PLLC charge $225 - $300 per hour for education law work (undersigned counsel charges a higher hourly fee for non-education work). The firm's Special Education Advocates each charge $175 per hour for their

21

services.  These amounts are reasonable in the community in which the action or proceeding arose for the kind and quality of services furnished. Services provided by a Special Education Advocate in connection with the Request for Due Process Hearing are akin to paralegal services.  *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285, 109 S. Ct. 2463, 2470, 105 L. Ed. 2d 229 (1989).

82.     The seventh *Johnson* factor considers the time limitations imposed by the client or the circumstances.  Due process cases are time insensitive given the time deadlines imposed from the IDEA.  The Hearing Officer is required to hold a hearing and issue a decision no later than seventy-five calendar days after a due process request is submitted.  The same considerations apply to the first and fourth factors apply to the seventh factor.

83.     Regarding the eighth *Johnson* factor (amount involved and the results obtained), Parents prevailed on a fundamental issue in the case – that FCPS denied FAPE by not providing Student with an IEP addressing his need for in-person instruction – and the Hearing Officer directed FCPS to pay tuition reimbursement for Private School 1. Although the Hearing Officer did not award reimbursement for all the private school tuition sought, Plaintiff alleges in this civil action that the Hearing Officer's Decision in that regard was incorrect and should be reversed.

84.     The ninth *Johnson* factor addresses the experience, reputation, and ability of the attorneys.  Belkowitz Law, PLLC primarily practices in the area of special education and practices throughout the Commonwealth of Virginia.  The law firm currently has four attorneys and employs two Special Education Advocates.  The firm has legal experience in all aspects of the special education process, including due process cases.  The law firm is well regarded and regularly gives presentations on special education law to groups in the Commonwealth of Virginia.

85.     The tenth *Johnson* factor looks at the "undesirability" of the case.  This case involved novel issues relating to the Covid-19 pandemic. In addition, there are few attorneys in the Commonwealth of Virginia who regularly practice special education law and have the experience to handling challenging due process matters, such as this case.

86.     Regarding the eleventh *Johnson* factor, the nature and length of the professional relationship with the client, Parents have been working with Belkowitz Law, PLLC since September 2020 regarding Student's special education.

87.     The twelfth *Johnson* factor looks at awards in prior cases. Courts routinely award attorneys' fees to prevailing parents in due process proceedings.  In *JP ex rel. Peterson v. County Sch. Bd. of Hanover County, Va.*, 641 F. Supp. 2d 499, 515 (E.D. Va. 2009), this Court awarded attorneys' fees to parents who prevailed in an IDEA case involving the parents' unilateral private placement.  The Court held that reimbursement at the lodestar amount of $300 per hour was reasonable.  *JP*, 641 F.Supp.2d at 515.  The Court awarded the parents $307,150.20 in attorneys' fees, and $8,369.69 in litigation expenses.  *Id.* at 525.  In *M.S. v. Fairfax County Sch. Bd.*, 1:05CV1476 (JCC), 2010 WL 11627263, at *7 (E.D. Va. Feb. 2, 2010), this Court awarded attorneys' fees to prevailing parent in a due process case at the rate of $395 per hour for three attorneys and $290 per hour for another attorney.

88.     As stated above, Plaintiff is prevailing party, having obtained a substantial award of tuition reimbursement. Plaintiff is entitled to the award of attorneys' fees and costs as the prevailing parties. 20 U.S.C. § 1415(i)(3)(B)(i); 29 U.S.C. § 794a. A party entitled to an award of attorneys' fees is also entitled to reimbursement for the time spent litigating its entitlement to attorneys' fees. *Am. Canoe Ass'n v. EPA*, 138 F. Supp. 2d 722, 746 (E.D. Va. 2001) (citing *Prandini v. National*

*TeaCo.*, 585 F.2d 47, 53 (3d Cir.1978)).  Pursuant to Federal Rule of Civil Procedure 54(d), such an award of attorneys' fees should be requested by a post-judgment motion made within fourteen days after the entry of judgment.

**Count Two:  Administrative Appeal Pursuant to IDEA
and Virginia Code § 22.1-213, *et seq*.**

89.     Plaintiff incorporates the allegations set forth in Paragraphs One through Sixty-Nine as if they were set forth in full herein.

90.     The Hearing Officer's Decision denied Parents' requests for reimbursement for private school tuition for the 2021-22 and 2022-23 school years. The Hearing Officer's Decision in that regard was factually and legally in error and should be reversed.

91.     The Hearing Officer's findings were not "regularly made" in accordance with applicable law and are not entitled to due weight.

92.     Virginia's IDEA regulations require that Hearing Officer to "Enter a disposition as to each determinative issue presented for decision and identify and determine the prevailing party on each issue that is decided."  8 VAC 20-81-210(P)(13).

93.     Among the reasons why the Hearing Officer's findings and conclusions are improper, not regularly made, and/or require reversal are:

   a.  The Hearing Officer disregarded that Parents signed the 2021-22 enrollment contract at a time when it was not known when Student might be eligible to return to in-person learning at FCPS for five days per week.

   b.  The Hearing Officer did not address Parents' claims that the November 2020 IEP and the January 2020 IEP denied FAPE because they did not appropriately address Student's lack of meaningful progress in reading, writing, and communication.

   c.  The Hearing Officer's Decision only addressed the denial of FAPE in the context of Student's inability to access an appropriate education by virtual instruction.

24

d.  The Hearing Officer improperly denied tuition reimbursement on the basis that FCPS was not required to provide Student an IEP for the 2021-22 and subsequent school years.

e.  The Hearing Officer improperly denied tuition reimbursement on the basis that Parents did not file their Request for Due Process Hearing until October 4, 2022, which was well within the applicable statute of limitations.

94.  The Hearing Officer's Decision was otherwise contrary to the law and evidence.

95.  Parents paid $57,030 for Student's tuition and associated fees at Private School 2 Tuition for the 2021-2022 school year and $59,819.76 for the 2022-23 school year.

96.  Plaintiff has exhausted administrative remedies.

97.  As a result of the Defendants' failure to provide Student with FAPE, Plaintiff is entitled to reimbursement for the tuition and associated paid for the 2021-22 and 2022-23 school year.

98.  Plaintiff incurred attorneys' fees and expenses in connection with the due process proceedings and will incur attorneys' and expenses in this proceeding. Plaintiff seeks an award of reasonable attorneys' fees and expenses, in an amount to be determined, if she is a prevailing party in this proceeding.

## **Count Three:  Declaratory Judgment**

99.  Plaintiff incorporates the allegations set forth in Paragraphs One through Sixty-Nine as if they were set forth in full herein.

100.  Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201.

101.  Pursuant to Viginia's IDEA regulations:

In cases where the decision is an agreement by the hearing officer with the parent(s) that a change in placement is appropriate, the hearing officer's decision must be implemented while the case is appealed and an implementation plan must be submitted by the local educational agency.

8 VAC 20-80-210(N)(16)(b); see also 34 CFR 300.518(a).

102.   The Hearing Officer's Decision held that the January 2021 IEP denied FAPE and that Student's appropriate placement was private day school placement.

103.   The Hearing Officer held that Student's placement at Private School 1 was appropriate.

104.   It was uncontested that Private School 2 was a proper private placement.

105.   The Hearing Officer's placement determination operates as Student's current education (or stay-put) placement because there is no other placement agreed-upon by Parents and FCPS.

106.   As the stay-put placement, FCPS is required to pay Student's private school tuition and associated fees for Private School 2 prospectively from the date of the Hearing Officer's Decision. The requirement exists independent from the Hearing Officer's ruling about reimbursement for Private School 2 tuition and fees paid prior to the Decision.

107.   Plaintiff contacted FCPS, by their respective counsel, regarding payment of Student's tuition and fees at Private School 2.

108.   FCPS denied any responsibility to pay Student's tuition and fees due subsequent to the Decision.

109.   An actual controversy exists between the parties.

110.   Plaintiff has exhausted administrative remedies.

WHEREFORE, J.S., a minor by his Parent and Next Friend L.S., asks that the Court:

1.　　Enter judgment in favor of Plaintiff and against Defendant on Counts One through Three;

2.　　With regard to Count One, award Plaintiff the attorneys' fees and expenses incurred as a prevailing party in the due process proceeding;

3.　　With regard to Count Two, conduct a review of the Hearing Officer's due process decision pursuant to the IDEA and Virginia Code §22.l-214 and reverse the Hearing Officer's Decision regarding the denial of reimbursement for private school tuition for the 2021-22 and 2022-23 school years;

4.　　With regard to Count Three, issue a declaratory judgment that Student's stay put placement during the pendency of the civil action is private day school and order Defendant to pay for Student's private school tuition and associated expenses during the pendency of this proceeding;

5.　　With regard to all Counts, award Plaintiff, as prevailing party, her attorneys' fees and expenses, court costs, and other compensable expenses; and

6.　　Award Plaintiff all other relief this Court deems fair and equitable.

Respectfully submitted,

*/s/ Harold G. Belkowitz*
Harold G. Belkowitz
Virginia State Bar No. 37274
hbelkowitz@belkowitzlaw.com
Belkowitz Law, PLLC
10427 North Street, Suite 200
Fairfax, Virginia 22030
(703) 246-9270 Office
(703) 246-9273 Direct
Counsel for J.S., a minor, by the Parent and Next Friend, L.S.